**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

May 5, 2021

**VIA ECF and Email**
Honorable Gregory H. Woods
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:   **United States v. Louis Bravo**
             **18 Cr 283 (GHW)**

Dear Judge Woods:

      Life as he knew it, ended on September 23, 2019.

      In September 2019, Louis Bravo lived in the Dominican Republic. A United States citizen, he had moved around frequently in the early 2000's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Yulia. By 2011, the couple moved to the Dominican Republic and began to establish a good and stable life.

      Mr. Bravo lived in a small home in a suburban area. He and Yulia were finally in a place to begin accumulating mementos – photo albums, a quirky lamp, decorative pillows. Mr. Bravo also started to build a physical home for his business. He had worked in consulting, promoting and web design since 1998, but in the DR he at last had a separate office. He bought desks, file cabinets, phones and computers to support his business.

Hon. Gregory H. Woods  May 5, 2021
United States District Judge  Page 2

Mr. Bravo never took his own health for granted ███████████ ███████████████████████████ While in the DR, he maintained excellent health through modest diet and exercise. With the exception of one childhood scar, he was relieved to have never suffered serious injury or illness.

All of that changed on September 23, 2019, when he was arrested.

### I.   Mr. Bravo has been punished more than sufficiently

#### A. Loss of home and property

When Mr. Bravo was grabbed by law enforcement on September 23rd, it cost him everything he had built in the Dominican Republic. He was arrested and detained by Dominican authorities for ten days before being brought to the United States. While he was immediately released on conditions at his initial presentment, he was not able to return to the Dominican Republic. His wife had been erroneously told that he was being arrested on narcotics trafficking. Confused and fearing for her own safety as a result, she quickly left the Dominican Republic as well.

As a result, Mr. Bravo's home and office sat vacant. He had no ability to pack up his cherished possessions and no one to secure his valuables. His furniture, his business files, his computers, even every item of clothing he owned was lost. He currently owns nothing and is dependent on the charity of his family.

This circumstance alone is unique and deeply punitive. In the typical case, a defendant rightly loses access to proceeds and instruments of their crime, but they

rarely lose access to all of their possessions, including keepsakes wholly disconnected from their offense.

Mr. Bravo has lost everything and has even separated from his wife as a result of his conduct and his arrest. These collateral consequences alone are sufficient to punish and deter him but in truth his extra-judicial punishment is far greater.

### B. Harsh conditions of confinement

Being arrested and removed from the DR was difficult for Mr. Bravo, but the manner of his removal was devastating. While the ten days he spent in custody in the DR may seem brief, it was a significant punishment in light of the conditions of his confinement.

In its 2019 report of human rights practices, the United States Department of State noted that conditions in "old-model" prisons in the DR were "harsh and life threatening."[1] The prisons are grossly over-crowded, with an internal report in September 2019 indicating that La Victoria prison, for example, held 7,758 inmates even though it was designed for a maximum capacity of 2,011.[2] All 19 old-model prisons exceeded capacity.

---

[1] Full report may be viewed via the State Department website at https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/dominican-republic/ or via pdf at https://www.state.gov/wp-content/uploads/2020/02/DOMINICAN-REPUBLIC-2019-HUMAN-RIGHTS-REPORT.pdf

[2] Id. at 3

Hon. Gregory H. Woods  May 5, 2021
United States District Judge  Page 4

Guards in old-model prisons were typically military and police, rather than professional correctional officers, leading to mistreatment and violence. Health and sanitation is generally "inadequate" with inmates sleeping on the floor and delays in medical attention.[3] Inmates typically had to purchase their own medicine or rely on family members to provide it. Previous iterations of the State Department report noted that most inmates begged for or purchased food from family and friends outside the prison as well. [4]

The Global Immigration Detention Observatory specifically critiqued the Dominican Republic's treatment of deportations noting "the Committee remains concerned at the practice of deporting foreigners in conditions that are incompatible with the provisions of the Covenant."[5][6]

Mr. Bravo does not know the name of the facility where he was detained for ten days. But every moment of his detention is emblazoned in his memory and is entirely consistent with State Department and Human Rights organization reports. Mr. Bravo recalls that the guards were military. He recalls being dragged by these

---

[3] https://www.state.gov/wp-content/uploads/2020/02/DOMINICAN-REPUBLIC-2019-HUMAN-RIGHTS-REPORT.pdf

[4] https://www.globaldetentionproject.org/wp-content/uploads/2020/11/Dominican-Republic-Detention-Data-Profile-2019.pdf

[5] https://www.globaldetentionproject.org/wp-content/uploads/2020/11/Dominican-Republic-Detention-Data-Profile-2019.pdf
[6]

Hon. Gregory H. Woods                                                                                                            May 5, 2021
United States District Judge                                                                                                          Page 5

guards, ██████████████████████. His wrists were in handcuffs for so long that they bruised and bled. He didn't have a bed and instead lay on the floor in pain. He had no access to a bathroom or running water. He was provided minimal food and dirty water.

For Mr. Bravo, the worst condition was the filthy floor, damp conditions and puddles of water. The stagnant water led to numerous flying insects and mosquitos ████████████████████████████████████████████████████

████████████████████████████████████████ It was not until his removal to the United States and his release on bond that he was able █

████████████████████████████████.

C. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.

Hon. Gregory H. Woods  May 5, 2021
United States District Judge  Page 6



## II.  It is Appropriate to Consider Conditions of Confinement When Imposing a Sentence

It is appropriate for this Court to consider the harsh and punitive conditions Mr. Bravo suffered while in the Dominican Republic, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ The Second Circuit has held that particularly harsh conditions of confinement pre-sentencing "may in appropriate cases be a permissible basis for downward departures" because it is a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (citing U.S.S.G. § 5K2.0). The logic the Second Circuit employed in *United States v. Carty* applies equally whether contemplating a departure or when considering the 3553(a) factors and determining whether a variance is warranted. In this case, the conditions under which Mr. Bravo was held were severe, terrifying, degrading, and punitive in a way the legislature and Sentencing Commission did not contemplate.

Given the denial of basic necessaries like beds, sanitary conditions, medical care, and hot meals, this case bears similarities to other cases in which courts downwardly departed because the defendant endured harsh conditions of confinement in a foreign prison while awaiting extradition to the United States. For example, in *United States v. Torres*, the court downwardly departed by 1 level where defendant spent five months in a prison in Combita, Colombia. No. 01 CR. 1078 (LMM), 2005 WL 2087818 (S.D.N.Y. Aug. 30, 2005). The court found that the incarceration was especially harsh as that prison had no heating in its cells, even during 40-degree nights, no hot water, and it only allowed those incarcerated to visit with friends and family once every 15 days. No. 01 CR. 1078 (LMM), 2005 WL 2087818 (S.D.N.Y. Aug. 30, 2005).

Similarly, in *United States v. Salvador*, the court downwardly departed where the defendant awaited extradition for five months in a facility in the Dominican Republic with "an almost complete lack of even minimal sanitary conditions and lack of food at times." No. 98 CR. 484 (LMM), 2006 WL 2034637, at *1 (S.D.N.Y. July 19, 2006). See also *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (finding that a departure was warranted where the federal defendant was subjected to "substandard conditions," and "extraordinary stress and fear" in a state prison for 13 months pre-sentencing).

Hon. Gregory H. Woods  
United States District Judge

May 5, 2021  
Page 8

While Mr. Bravo spent a comparatively short time in detention in the Dominican Republic, the severity of the impact on him weighs in favor of a significant variance.

### III. Mr. Bravo's character

Mr. Bravo is now 50 years old and this case, his first arrest, is a true aberration. Mr. Bravo, as described by his family and friends, is "a good person, with a very genuine heart." **Ex. B**. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Mr. Bravo left school to come and help support the family. **Ex. C**. Even now, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮, he has once again taken on the role of caregiver. He runs errands for his elderly mother and helps his neighbors. **Ex. B.**

Mr. Bravo's character can also be seen in his ready acceptance of responsibility. He has long sought to resolve this case with a plea and candid admission of guilt. However, he has been delayed by the COVID pandemic and the accompanying restrictions. Mr. Bravo has also been open and honest with his family about his conduct. They all write that Mr. Bravo has expressed genuine remorse for his choices and his criminal conduct. And critically, he knows that the repayment of restitution is a key element in making reparations for his conduct. He is eager ▮▮▮▮▮▮▮▮▮▮▮▮▮ to begin the process of "paying back everyone involved." **Ex. A**.

Hon. Gregory H. Woods  May 5, 2021
United States District Judge  Page 9

Lastly, Mr. Bravo has demonstrated his character through 19 months of perfect compliance with pretrial supervision. PSR ¶ 8. His has demonstrated through his post-arrest conduct that he is an exemplary candidate for supervised release.

### IV.  Appropriate Sentence

#### A. The fraud guideline is not entitled to deference

In crafting an appropriate sentence, this Court must of course consider the guidelines, though it need not follow them because the guidelines are merely advisory and may not be presume to be reasonable in a given case. *See Gall v. United States*, 552 U.S. 38, 50 (2007). Here, the applicable guideline does not merit deference. Rather, as the Second Circuit recognized in *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016), the fraud guideline's overwhelming focus on the loss amount should lead courts to consider non-Guidelines sentences. *Id.* at 800.

In considering the weight to be afforded to the Sentencing Guidelines in a particular case, in *Kimbrough v. United States*, 128 S. Ct. 558, (2007), the Supreme Court effectively recognized that not all guidelines are equal: while some "exemplify the Commission's exercise of its characteristic institutional role," others do not. Id. at 575. In cases involving application of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role," it is "not an abuse of discretion for a district court to conclude when sentencing a particular

defendant" that the application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." Id.

In *Rita v. United States*, 551 U.S. 338 (2007), the Court reasoned that if a particular guideline was originally based on past sentencing practices, and revised in response to sentencing data and other research, then it seems fair to assume that recommendations truly embody the statutory goals of §3553(a). Id. at 349. Conversely, when a guideline is not developed according to this practice, there is less reason to believe that it embodies the statutory objectives and deserves deference, even in a mine-run case. *Kimbrough*, 552 U.S. at 109.

Section §2B1.1 is an example of one guideline that is not based on historical sentencing practices or research, but rather is solely focused on the overall loss amount, which is a poor measure of culpability. As the Second Circuit recently explained,

> The Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss. Instead the Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider.

*Algahaim*, 842 F.3d at 800. The Second Circuit has invited District Courts to consider non-Guidelines sentences in fraud cases for this reason. *Id.* ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence."); *see also, e.g., United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) (describing how fraud guidelines effectively ignore everything but the loss amount and that many of the resulting Guidelines-recommended sentences are "irrational on their face"); *United States v. Ovid,* 09 Cr. 216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010) (criticizing § 2B1.1).

More generally, the history of §2B1.1 shows the fraud guideline to lack any sound policy rationale. It was not based on empirical research concerning deterrence or any other relevant factor for the purposes of sentencing. It was not even originally intended as a codification of past sentencing practices. To the contrary, it was written with the goal of increasing the severity of sentences over historic levels. *See United States v. Corsey,* 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). ("The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides.").

Hon. Gregory H. Woods  May 5, 2021
United States District Judge  Page 12

In light of the criticism surrounding the fraud guideline, it is not surprising that statistics provided by the Sentencing Commission find that that courts rarely give Guidelines sentences in fraud cases. Excluding cooperators, courts in this district gave below-Guidelines sentences in 61.4% of fraud cases in fiscal year 2019, the most recent year for which statistics are available. See U.S. Sentencing Commission Statistical Information Packet for Fiscal Year 2019, Southern District of New York at Table 10.[7] Including cooperators, the figure is 76.1%. Id.

B. The 3553(a) factors weigh in favor of time served

Rather than being anchored by the guidelines, this Court should instead give greater weight to the 3553 factors. When balancing the need for punishment, specific and general deterrence and rehabilitation, the appropriate sentence is time served and supervision.

As discussed more fully above, Mr. Bravo has been more than sufficiently punished and deterred by his arrest, incarceration ▮▮▮▮▮▮▮▮▮▮. General deterrence has also been met. In a mine run fraud case with a fairly modest loss amount compared to some of the more exorbitant cases in this district, Mr. Bravo lost all of his worldly possessions, was held in military custody ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Any person in the community observing Mr. Bravo's case would be adequately deterred by his treatment and the result.

---

[7] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/nys19.pdf

Hon. Gregory H. Woods  May 5, 2021
United States District Judge  Page 13

Lastly, looking to Mr. Bravo's need for training and treatment, supervision is the only appropriate sentence. Mr. Bravo is not in need of educational or vocational training ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████

**Conclusion**

The events of September 23, 2019, forever changed Mr. Bravo's life. He has been severely punished. He deeply regrets his past crimes. And he is committed to paying back his victims.

For all the foregoing reasons, I ask the Court to sentence Mr. Bravo to time served and a period of supervision.

    Respectfully submitted,

    /s/
    Jennifer E. Willis, Esq.
    Tamara Giwa, Esq.
    Assistant Federal Defenders

Cc:    Louis Bravo
       AUSA Emily Johnson